UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------
SONY MOBILE COMMUNICATIONS
INC.,

      Plaintiff,

  -against-

EVS CODEC TECHNOLOGIES, LLC,
and SAINT LAWRENCE
COMMUNICATIONS, LLC,

      Defendants.
------------------------------------

18-cv-9518 (JSR)

OPINION AND ORDER



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/24/19

JED S. RAKOFF, U.S.D.J.

On March 27, 2019, the Court denied plaintiff's motion for partial summary judgment. This Opinion explains why.

Plaintiff Sony Mobile Communications Inc. ("Sony") is a Japanese corporation that sells mobile phones. In 2014 and 2015, Sony and Sony's America affiliates were sued by Saint Lawrence Communications LLC ("Saint Lawrence") and Saint Lawrence Communications GmbH (its German counterpart). Saint Lawrence claimed that certain of Sony's devices practiced a telecommunications standard known as Adaptive Multi-Rate Wideband (AMR-WB) and so infringed Saint Lawrence's patents. Pl. Statement of Material Facts ("Pl. SOMF") ¶ 1, ECF No. 75.[1] To settle the

---

[1] ECT's submission responding to Sony's Statement of Material Facts did not "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party," as required by Local Rule 56.1(b). All such statements are therefore "deemed to be admitted" for purposes of this motion. Local Rule 56.1(c). The same is

1

litigation, on March 31, 2015 the parties executed two patent license agreements ("PLAs"), one limited to Germany and the other to the rest of the world. Id. ¶ 2.

As relevant to the instant motion, the PLA applicable to the United States contains three important provisions. First, it grants Sony a license to sell "Licensed Products, under the Licensed Patents . . . solely for the purpose of complying with and practicing the AMR-WB Standard," which explicitly "excludes any right . . . to practice any standard other than the AMR-WB Standard." Moore Decl. Exh. 1 ¶ 2.1, ECF No. 76-1. "Licensed Products" means any product sold by Sony to consumers that is compatible with the AMR-WB Standard. Id. ¶ 1.11.

Second, Saint Lawrence and its subsidiaries, successors, and assigns "covenant[] not to sue [Sony] . . . for infringement of any patents owned or controlled or licensable by [Saint Lawrence] during the Term of this Agreement ("Covenant Patents") solely with respect to Sony Products for the life of such patents." Id. ¶ 2.7. "Sony Products" means "any service or product (including any technology or component within such product) commercially available to an End-User as of the Effective Date [i.e. March 31,

---

true of any statements which ECT purported to dispute, but which ECT either failed to "specifically controvert[]," Local Rule 56.1(c), or for which ECT failed to include "citation to evidence which would be admissible," Local Rule 56.1(d).

2015] and any upgrades, enhancements or natural evolutions thereof." Id. ¶ 1.16.

Finally, each party releases all claims against the other related to the Licensed Patents or the AMR-WB Standard that arose prior to the date of the agreement. Id. ¶¶ 2.2-2.4.

On September 24, 2018, defendant EVS Codec Technologies, LLC ("ECT") sent Sony a letter in which ECT represented that it was the successor of Saint Lawrence's interest in the relevant patents. Pl. SOMF ¶ 11. In that letter, ECT accused Sony of infringing those patents by including the Enhanced Voice Services audio coding standard ("EVS") in its phones. See Compl. Exh. C at 1-3, ECF No. 17-3. ECT offered Sony a license to practice the EVS standard and threatened litigation if Sony refused. Id. at 3-4.

Sony responded by filing the instant suit, seeking declaratory and injunctive relief that it is protected from litigation by the covenant not to sue. Pl. SOMF ¶ 12. ECT counterclaimed for patent infringement. Id. ¶ 13. ECT also added Saint Lawrence as a defendant/third-party plaintiff.

Sony now moves for summary judgment on its claim that the covenant not to sue bars defendants' infringement claims. At the outset, the Court notes that the parties agree on several material points. First, ECT is bound by the PLA as a successor or assign of Saint Lawrence. Second, because defendants' infringement contentions relate to the EVS Standard, not AMR-WB, the license

3

provisions of the PLA are not applicable. Third, the patents asserted by defendants were also involved in the prior litigation. Pl. SOMF ¶ 15. Fourth, Sony does not contend that any of the products accused in this litigation were commercially available prior to March 31, 2015.

The question before the Court therefore narrows to a single issue: are Sony's post-PLA phones nonetheless protected by the covenant not to sue because they are "upgrades, enhancements [or] natural evolutions" of Sony's pre-PLA phones?

Summary judgment is appropriate when, drawing all reasonable inferences in favor of the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See S.E.C. v. Kern, 425 F.3d 143, 147 (2d Cir. 2005); Fed. R. Civ. P. 56(a). "The non-moving party may not rely on conclusory allegations or unsubstantiated speculation," but must "produce specific facts indicating that a genuine factual issue exists." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (quoting Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998)).

The PLA here at issue is governed by New York law. Pl. SOMF ¶ 4. Under New York law, the terms of a contract should ordinarily be given their plain meaning. Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012). The contract must be considered as a whole, and the terms construed to avoid rendering any clauses superfluous, if possible. Id. "[T]he meaning of a contract that is

4

unambiguous is a question of law for the court to decide." Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000). So is the meaning of an ambiguous contract "if there is no extrinsic evidence as to the agreement's meaning." Id. But if there is extrinsic evidence as to the meaning of an ambiguous contract, the meaning is a question of fact. Id.

A contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (quoting Internat'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002)). Conversely, a contract is unambiguous if the language used has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Law Debenture Trust Co., 595 F.3d at 467 (internal quotation marks omitted; alteration in original) (quoting Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989)). The ambiguity of a contract must appear in the document itself; it cannot be supplied by extrinsic evidence. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009).

5

However, when a contract uses specialized terms, the court may consider evidence of custom and usage to illuminate the meanings of those terms. Law Debenture Trust Co., 595 F.3d at 466. The court may not, however, consult extrinsic evidence of the parties' subjective intentions. Id.

Here, both sides agree that the phrase "upgrades, enhancements or natural evolutions" is not ambiguous. Tr. March 20, 2019 at 8:21-9:3, 16:5-6. They differ, however, as to what it unambiguously means. Sony, relying chiefly on dictionary definitions, contends that the "plain meaning" of the phrase denotes an enhancement, improvement, or development. Pl. Mem. Supp. S.J. 12 ("Pl. Mem."), ECF No. 74. For Sony, then, a newer phone is an upgrade of an older phone if the former includes better components than the latter, such as improved memory, cameras, or screen resolution. Pl. Mem. 21-24. For additional support, Sony notes that wireless carriers and smartphone manufacturers regularly use the word "upgrade" to refer to a customer replacing their phone with a newer, better model. Pl. Mem. 14-15 (citing Moore Decl. Exhs. 11-18).

Sony's interpretation comports with ordinary usage of the terms at issue. As defendants point out, however, it is rendered significantly less plausible given the context of the PLA as a whole. On Sony's interpretation, any new phone it makes that is better in any respect than a phone it sold prior to March 31, 2015

6

- which, given the steady pace of improvements in smartphone technology, means every new phone it makes - is immune from suit for infringing any of defendants' patents. But if the parties intended such a broad immunity clause, it is hard to see why they would have accomplished it through what at first glance appears to be a narrow covenant not to sue. Presumably, tying the definition of "Sony Products" to the effective date of the PLA was intended to accomplish something; but on Sony's reading, the covenant applies to virtually every phone Sony makes going forward. Moreover, as defendants argue, this grant of immunity would render the specific license provisions largely superfluous. Def. Mem. Opp. S.J. 11-12 ("Def. Mem."), ECF No. 90. Why would the parties have negotiated a narrow license, expressly limited to use of the AMR-WB Standard, if they meant to give Sony the functional equivalent of a license to practice any standard encompassed by defendants' patents?[2]

---

[2] Some of the arguments in defendants' opposition papers seemed to suggest that no provision of the PLA applies unless the AMR-WB Standard is involved. E.g., Def. Mem. 9 ("Sony cannot dispute that the AMR-WB Agreement - by its express terms - is a field-of-use license restricted to practicing the AMR-WB Standard."). Based on the oral argument, however, the Court does not understand defendants to contend that the covenant not to sue applies only to use of the AMR-WB Standard. See Tr. March 20, 2019 at 19:4-13 (acknowledging that "covenant patents" is "broader than license patents" and applies outside the context of AMR-WB). In any event, the PLA is quite clear that the covenant not to sue applies to "any patents owned" by Saint Lawrence or ECT. Moore Decl. Exh. 1 ¶ 2.7 (emphasis added).

7

Sony argues that the license provision still has work to do under its interpretation because the covenant not to sue only applies to improvements on existing product lines. Pl. Mem. 17. Thus, if Sony branched out into a new area – such as smart appliances – the covenant not to sue would not protect it, but the license would to the extent that the new products practiced AMR-WB. The Court is not persuaded; this reading still leaves the license provision with precious little to do, essentially rendering it irrelevant until and unless Sony decides to market an entirely new product line that incorporates AMR-WB. Given the context under which the PLA was adopted – to resolve litigation that was specifically directed at Sony's alleged use of AMR-WB in its phones – that seems very unlikely. Sony's reading of the "upgrades" clause is thus in tension with the remainder of the PLA.

Moreover, while Sony's evidence of industry custom and usage establishes that upgrade can at least sometimes refer to any better device, it falls short of demonstrating that the word always carries that meaning. Indeed, Sony's own corporate representative testified that there is no "industry-wide understanding" as to the meaning of "upgrade," "enhancement," or "natural evolution." McBride Decl. Exh. B 23:19-25:8, ECF No. 92-2. Drawing all reasonable inferences in favor of defendants, as the Court must at

this stage, compels the conclusion that the PLA does not unambiguously embody Sony's interpretation.

For these reasons, the Court is not persuaded that Sony's interpretation of the contract is the best one, let alone unambiguously correct. That alone justifies the denial of summary judgment at this time. Defendants urge, however, that the Court should not simply conclude that the contract is ambiguous, but should instead endorse their reading as unambiguously correct. Tr. March 20, 2019 at 22:12-20. The Court therefore considers whether defendants' reading is compelling.

Defendants argue that the "upgrades" clause refers only to improvements of a given product – for example, updating the battery or antenna of a particular phone at the behest of a wireless carrier – rather than improvements within a product line. Def. Mem. 3; Tr. March 20, 2019 at 20:4-11. Defendants claim that the covenant not to sue was intended to give Sony assurance that its existing products were free from litigation, including incidental improvements that might be made to those products, but that the covenant was not to apply to any new products. Def. Mem. 16.

Defendants' argument reconciles the operation of the covenant clause with the licensing provisions. It is plausible that the parties bargained for total litigation peace with respect to existing products, but intended for the limited license to govern new products. However, defendants' argument is less convincing as

9

a matter of plain language and ordinary usage. Defendants have submitted no evidence suggesting that "upgrades, enhancements or natural evolutions" is a phrase used in the mobile phone industry to refer to incremental, carrier-directed improvements to a particular device. Nor have they rebutted Sony's evidence that the word "upgrade," at least, is sometimes used to refer to a new, better device, rather than an improvement upon an existing device.

Moreover, as the Court pointed out at oral argument, the phrase "natural evolution" strongly suggests a change from one thing to another. Tr. March 20, 2019 at 25:14-17. Defendants contend that the existing caselaw shows that the phrase is a term of art that refers to the standard for obviousness in the context of prior art. Id. at 25:25-26:8. Even assuming this is right, that does not help defendants.[3] The very nature of "prior art" is that it is a separate invention that renders obvious a future invention. If the phrase "upgrades, enhancements or natural evolutions" is

---

[3] Although it is not material to the disposition of this motion, the Court does not believe this is an accurate characterization of the caselaw. A search for the phrase "natural evolution" on Westlaw yields only two Federal Circuit and two Supreme Court decisions. Of those four, three do not use the phrase in the context of prior art. In the last, State Indus., Inc. v. Rheem Mfg. Co., 769 F.2d 762 (Fed. Cir. 1985), the Federal Circuit quoted the district court as using the phrase "natural evolution," and noted that "[w]hile the district court's reference to the 'natural evolution' may have been unfortunate if intended as a new standard of patentability, which we think it was not, in the ultimate legal analysis it was harmless." Id. at 763. Contrary to defendants' argument, then, it does not appear that either the Federal Circuit or the Supreme Court have ever endorsed "natural evolution" as a formulation for discerning the existence of prior art.

10

intended to signal something like an obviousness inquiry, then it clearly does apply to at least some new products, contrary to defendants' argument.

Finally, defendants argue that, even if their interpretation is not correct, the Court should not deem the contract language ambiguous because ambiguity requires competing reasonable interpretations, and Sony's proffered interpretation is not reasonable. Tr. March 20, 2019 at 31:3-8. The Court disagrees. Sony's interpretation may be so broad as to be unreasonable in the context of the entire contract; but the Court need not, and therefore does not, decide that issue now. For there is still a range of meaning that could be given to the phrase "upgrades, enhancements or natural evolutions" between the parties' extremes. The phrase might, for example, apply to some but not all of Sony's new phones, depending on how closely related the new product is to a pre-March 31, 2015 phone.

The Court therefore concludes that the language at issue is ambiguous. Defendants argue that, if the language is ambiguous, the doctrine of contra proferentem means that the term should be read against Sony, as the party that introduced the phrase. Def. Mem. 18. Defendants rely on a selection of prior drafts of the PLA that the parties exchanged during negotiations.

The Court is not persuaded that contra proferentem has any substantial weight in this case, for two reasons. First, the

11

doctrine is weaker in a case like this, where two sophisticated parties bargained over a series of draft agreements. Indeed, the PLA itself recites that it was "voluntarily and mutually agreed upon after intensive negotiations." Moore Dec. Exh. 1 ¶ 7.10.

Second, and more fundamentally, defendants have not demonstrated that Sony was, in fact, the party who drafted the pertinent phrase. Defendants rely on a March 29, 2015 email from Sony that included a redlined draft of the PLA in which the phrase "upgrades, enhancements and natural evolutions" was added to the definition of "Sony Products." McBride Decl. Exh. H. But a comment attached to the phrase states that Sony "mentioned the 'natural evolutions' concept" in the parties' first conference call, and Saint Lawrence "included it in [its] 24 March draft." Id. Moreover, in an earlier draft, it appears that Sony deleted the predecessor language, which was "any natural extensions, error corrections, or updates to such Sony Products." McBride Decl. Exh. I.

Sony points out, moreover, that this evidence of drafting history is incomplete. Sony Reply Mem. Supp. S.J. 8 n.3. The Court agrees. Without the context of the prior discussions and drafts referenced by defendants' exhibits, the Court is not willing at this time to conclude that Sony was the exclusive drafter of the pertinent phrase. Contra proferentem therefore does not resolve the ambiguity.

12

It is true that "[e]ven where some ambiguity lurks in the language of the contract, a court may still construe the contract, if it can do so without reference to extrinsic circumstances or evidence." Brass v. American Film Tech., Inc., 987 F.2d 142, 148 (2d Cir. 1993). But because the PLA is ambiguous on this point, extrinsic evidence may be consulted to determine its meaning, which is a question of fact rather than law. See Revson, 221 F.3d at 66. It would therefore be inappropriate to definitively construe the meaning of the phrase "upgrades, enhancements or natural evolutions" based on this incomplete record. See Brass, 987 F.2d at 150 ("When what the parties intended cannot be definitely and precisely gleaned from a reading of the contract, they should be afforded an opportunity to present extrinsic evidence to establish their intent.") (internal quotation marks) (quoting Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 430 (2d Cir. 1992)). Once discovery is complete, the parties may, if they wish, ask the Court to construe the contract based on a full record.

Accordingly, Sony's motion for partial summary judgment is denied. The Court declines ECT's invitation to offer a definitive construction of the contract at this stage. The Clerk of the Court is directed to close document number 73 on the docket of this case.

SO ORDERED.

Dated: New York, NY

April 23, 2019

JED S. RAKOFF, U.S.D.J.